D. Maimon Kirschenbaum
JOSEPH KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 981-9587 (fax)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**DANIELLE GRIMM, on behalf of herself and**
**others similarly situated,**

           **Plaintiff,**

      **v.**

**CHARTER COMMUNICATIONS, LLC,**

         **Defendant.**
-------------------------------------------------------x

**CASE NO.** 1:25-cv-603 (AMN/PJE)

**FLSA COLLECTIVE ACTION**

**COMPLAINT**

     Plaintiff Danielle Grimm, on behalf of herself and all others similarly situated, alleges as follows:

### INTRODUCTION

     1.     Plaintiff was a model employee, working overtime without complaint, or proper compensation, just to serve her employer.

     2.     But, when she became ill and needed FMLA leave, and then complained of wage theft and religious discrimination, her supervisor and Charter launched a relentless campaign of retaliation that now threatens to leave her without a job after more than a decade of dedicated work.

### JURISDICTION AND VENUE

     3.     Plaintiff Danielle Grimm brings this action against Defendant Charter Communications, LLC alleging claims of retaliation in violation of the Family and Medical Leave Act ("FMLA"), 28 U.S.C. §§ 2601, et seq., and discrimination claims under Section 1981 of the

Civil Rights Act ("Section 1981"), 42 U.S.C. §1981 and the New York State Human Rights Law ("NYSHRL"). Plaintiff also brings this action against Defendant alleging overtime claims under the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* ("FLSA"), and New York Labor Law §215 and §232 ("NYLL"). Plaintiff also brings this action under New York Labor Law § 740 ("NYLL §740").

4.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the FMLA, Title VII and the FLSA. This Court has supplemental jurisdiction over the New York state law claims brought under the NYSHRL and NYLL, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

6.      Defendant Charter Communications, LLC ("Charter" or the "Company") is a Delaware limited liability company headquartered in Stamford, Connecticut with offices in Albany, New York and throughout the United States. Charter is an employer under the FMLA, as it employs more than 50 employees within a 75-mile radius from its Albany, New York location. Charter is a communications company that offers internet, television, and phone services. It is one of the largest cable operators in the United States.

7.      Charter has an annual revenue in excess of $500,000.

8.     Charter has employees engaged in interstate commerce and handling, selling, or otherwise working on goods and materials that have been moved in or produced for interstate commerce.

9.     Plaintiff Danielle Grimm ("Plaintiff") has worked for Charter and its predecessor entities since in or about 2013. Plaintiff works in Charter's Albany office and is a resident of Schenectady, New York. Plaintiff is an observant Jewish woman with a kidney condition that requires ongoing care.

## FLSA COLLECTIVE ACTION ALLEGATIONS

10.     Plaintiff brings the First Claim for Relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all individuals employed by Defendant in the United States in a salaried position on or after the date that is three years before the filing of the Original Complaint in this case as defined herein ("FLSA Collective Plaintiffs").

11.     At all relevant times, Plaintiff and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subject to Defendant's decision, policy, plan and common policies, programs, practices, procedures, protocols, routines, and rules willfully failing and refusing to pay them overtime.   The claims of Plaintiff stated herein are essentially the same as those of the other FLSA Collective Plaintiffs.

12.     The First Claim for Relief is properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. 216(b).  The FLSA Collective Plaintiffs are readily ascertainable.  For purpose of notice and other purposes related to this action, their names and addresses are readily available from the Defendant.  Notice can be provided to the

FLSA Collective Plaintiffs via first class mail, email, and text message to the last address, email address, and cell phone number known to Defendant.

## FACTS

### Wage and Hour Claims

13.     Plaintiff's Consent to Sue form is attached as Exhibit A.

14.     Charter committed the following alleged acts knowingly, intentionally and willfully.

15.     As a Supervisor Plaintiff is paid a flat salary without getting paid an overtime rate for the hours she worked over 40 hours in a workweek.

16.     Although Plaintiff is required to submit her own timecards every two weeks, she is not permitted to document her actual hours worked on those timecards. Charter instructed Plaintiff, and all Supervisors like her, to submit timecards every two weeks that simply indicate whether she took time off from her assigned weekly schedule so that sick time, paid time off ("PTO"), and other forms of leave are properly recorded.

17.     Charter schedules Plaintiff for five nine-hour shifts per week. Plaintiff works these shifts in the Charter office and spends an additional five to twenty hours per week, depending on the time of year, auditing the calls of sales agents and attending required meetings.

18.     Charter's policy allows Plaintiff to take a one-hour lunch break each day, but it does not track when or if she takes those breaks. In fact, Plaintiff rarely takes a full lunch hour because she has so much work to complete.

19.     Further, Plaintiff must regularly audit the calls of her agents to ensure that the team is following Charter policies and sales process and not doing anything that could be deemed commission manipulation. Each month Plaintiff is required to audit four calls per agent on her

team plus up to 12 calls per month from agents on other teams. Each call is approximately 45 to 60 minutes.

20.     Over the past six years, Plaintiff has had between eight and 34 agents on her team.

21.     Because Plaintiff is generally busy supporting sales agents throughout her nine-hour shifts, Plaintiff must spend between five to ten additional hours per week, outside of her official shift schedule, auditing and documenting sales calls. That is in addition to not taking lunch breaks and attending required meetings outside of her regular work hours.

22.     Plaintiff's paystubs do not include her actual overtime hours worked or overtime rate. This allows Charter to hide the fact that Plaintiff is in fact entitled to be paid an overtime premium, thus preventing Plaintiff from determining and seeking the precise amount of her unpaid wages.

23.     Charter willfully committed the foregoing acts against Plaintiff and the FLSA Collective Plaintiffs.

## **Plaintiff's Discrimination and Retaliation Claims**

24.     Plaintiff began working for Defendant's predecessor Time Warner Cable in 2013 as a sales agent. Over the course of the next 12 years, Plaintiff advanced to various positions and received raises throughout her tenure.

25.     In or about 2015, Plaintiff was promoted to an Inbound Sales Supervisor, a position she held until 2018. In this position, one of Plaintiff's responsibilities was to review the timesheets of Sales Agents. During this time, Plaintiff was trained how to review and correct timesheets to accurately reflect the hours worked by each Sales Agent.

26.     In or about 2018, Plaintiff transferred to the retail sales department, where she remained until in or about 2021.

27. In or about 2019, Charter purchased Time Warner Cable and called the group of acquired companies, Spectrum.

28. Plaintiff remained employed after the acquisition.

29. In or about 2021, Plaintiff returned to working as an Inbound Sales Supervisor.

30. Initially, Plaintiff's role required that she spend all of her time auditing the calls of sales agents. In order to meet the quota of calls she had to audit, Plaintiff worked between 50 and 60 hours each week.

31. In late 2022 Shawn Beach became a Director and Plaintiff's supervisor. From the beginning of his leadership of Plaintiff's team, Mr. Beach took issue with Plaintiff's need for a Sabbath-accommodating schedule.

32. Beginning in 2022, Plaintiff's main task changed to supporting a team of sales agents assigned to her. That support comprises coaching her team of sales agents on the sales process dictated by Charter and teaching sales agents the "script" they must use when engaging with potential clients.

33. Plaintiff's work also includes auditing the sales agents' calls to make sure they are staying on "script" and keeping agents aware of their monthly sales numbers so she can help them meet their sales goals. Plaintiff also assists sales agents with work order entry and setting up billing of new clients.

34. On occasion, Plaintiff may be assigned to deliver a corrective action to a sales agent, regardless of whether she agrees with it.

35. When a sales agent calls in sick, Plaintiff has been instructed to attempt to convince the agent to come in anyway. Over the years, she has also been instructed to write up agents who miss work for illness-related reasons.

36.     Plaintiff does not assign or determine sales agents' schedules and does not approve her agents' requests for vacation time.

37.     While in the role of Inbound Sales Supervisor, Plaintiff is paid a base salary and a bonus based on the sales performance of the sales agents that report to her.

38.     Although she holds a "Supervisor" title, Plaintiff's role does not require that she exercise discretion, and she is not empowered to hire or fire employees.

39.     Plaintiff is responsible for reviewing and correcting, when necessary, the timesheets submitted by the sales agents on her team to ensure they comply with Charter's timekeeping policies.

40.     Because of the frequent technical problems with Charter's phone system and timekeeping platform, Avaya and Charter Time, respectively, sales agents' timecards often have too many "punches" in and out.

41.     For example, sales agents punch in to work by logging in to the Avaya phone system. When the Avaya system disconnects or malfunctions, it automatically punches out the sales agents on Charter Time. The agents must then clock back in several minutes later even though they have been working throughout.

42.     Part of Plaintiff's job was to be aware of these extra punches and edit the timecards to reflect all hours worked by each of her team members.

43.     Plaintiff had been trained in 2015 regarding the review of timesheets, and by 2021, Charter had entrusted her with teaching other Supervisors this process.

### Plaintiff Requires a Religious Accommodation and FMLA Leave

44.     From the beginning of Plaintiff's employment with Charter and its predecessor, Time Warner Cable, Plaintiff requested and was granted a work schedule that accommodated her

Jewish religious observance. In particular, she maintained a schedule that did not require her to work from sundown on Fridays until after sundown on Saturdays because of the Jewish Sabbath. Plaintiff also took time off as needed for specific Jewish holidays during the year.

45.     For years, Charter had no issue with Plaintiff's schedule or religious accommodation. Plaintiff worked a variety of shifts over the years, and all of them accommodated her Sabbath observance.

46.     Plaintiff had positive performance reviews each year of her employment and always received an annual merit-based increase in pay.

47.     Plaintiff currently reports directly to Inbound Sales Manager Felicity Wynn. Ms. Wynn reports to Shawn Beach, who in turn reports to Vice President John Scuteri.

48.     In January of 2023, Plaintiff was hospitalized for septic shock related to kidney infection and took several weeks of Family Medical Leave Act ("FMLA") protected leave.

49.     Following Plaintiff's illness, she required intermittent FMLA leave because of the occasional migraines and other symptoms caused by her kidney medication.

50.     Since her illness, Plaintiff has used this preapproved intermittent FMLA leave approximately once per month although she has permission to use it much more frequently.

51.     In early 2023, Charter planned to conduct a shift bid for Supervisor schedules. Because of her long tenure and good performance, Plaintiff ranked high in the shift bid process and easily qualified for the shifts that accommodated her Sabbath observance. That said, Plaintiff was also be entitled to her preferred shift based on her religious requirement that she not work on the Jewish Sabbath.

52.     Although Plaintiff's religious needs had never been an issue for any of her supervisors previously, following Plaintiff's FMLA leave and request for ongoing intermittent FMLA leave, Mr. Beach began harassing Plaintiff about her need for a religious accommodation.

53.     When HR approved Plaintiff's request for the Sabbath accommodating schedule in May 2023, Mr. Beach, told Plaintiff that he didn't think she "deserved" to have that shift. Mr. Beach also threatened to change her shift based on his belief that Plaintiff did not "deserve" the shift she had.

54.     In June 2023, for the first time since 2019, Charter suddenly illegally required Plaintiff to "recertify" or prove her need for a religious accommodation that allowed her to work all days except the Jewish Sabbath.

55.     Plaintiff provided Charter's human resources department ("HR") with all the documentation it required, including a letter from Plaintiff's rabbi attesting to her religious observance and need for an accommodation for her schedule.

56.     In June 2023, Mr. Beach and HR Director Renee Gannon-Burke met with Plaintiff about her shift assignment. When they informed Plaintiff that she would have to take a different weekly shift, Plaintiff reminded them that she needed to work Sunday through Thursday because of her observance of the Jewish sabbath.

57.     Mr. Beach and the HR Director responded to Plaintiff saying, "We did so much for you and kept your job for you when you were sick," implying that Plaintiff should be happy she has a job and should not request any accommodations.

58.     Following that meeting, in June 2023, HR required Plaintiff to again "certify" or prove her need for a religious accommodation to take time off for the Jewish holidays.

59.    Nothing in Plaintiff's behavior since she updated her religious accommodation request earlier in 2023 indicated that she had changed her religion or level of religious observance. Further, there was no change to her role that necessitated more verification of Plaintiff's religious needs. Plaintiff had been observing the Jewish sabbath and holidays in the same way for years without issue.

60.    However, after joining Mr. Beach's team and then taking FMLA leave, Plaintiff was suddenly required to prove her religious identity and faced pressure to relinquish her accommodation.

61.    Plaintiff did keep her Sabbath-accommodating schedule at that time.  However, in retaliation for taking protected leave and making an accommodation request, Mr. Beach assigned Plaintiff a new team of sales agents, many of whom were underperformers and some who did not share Plaintiff's schedule. This caused Plaintiff to have to work more hours than her scheduled shift in order to support sales agents that were working earlier or later than Plaintiff's designated hours.

62.    Prior to taking FMLA leave, Plaintiff's team of agents always shared the same schedule as Plaintiff. After taking FMLA leave, Plaintiff was assigned for the first time a group of agents whose schedules did not align with her own.

63.    These circumstances continued from approximately June 2023 through December 2023.

64.    During this period, Plaintiff worked at least 50 hours per week. She worked her official schedule, did not take lunch breaks, and then also worked approximately four more hours each week responding to the needs of her team members whose hours extended prior to and after Plaintiff's official workday.

65.     In December 2023, Mr. Beach further retaliated and informed Plaintiff that she would be moving to a pilot program where she would not be able to earn a commission. She would receive a guaranteed amount of money each month instead of commission.

### Plaintiff Reports Wage Theft

66.     Soon after starting to work within Charter's pilot program, Plaintiff noticed that her guaranteed pay had decreased by over one thousand dollars per month.

67.     By June 2024, Plaintiff's "guaranteed commission" was down to $300 per month.

68.     Plaintiff only learned that she would receive $300 for June on the second to last day of the month. Thus, Plaintiff worked for a full month with the understanding that she would earn a specific amount of money, but just days before the end of the pay period learned that her earnings for that period would be significantly lower.

69.     Plaintiff reported the problem to Mr. Beach, who responded that there was nothing he could do to fix the problem.

70.     In August 2024, Plaintiff reported the improper pay practices to General Vice President John Gomez.

71.     Mr. Gomez confronted Mr. Beach about the improper pay, and the issue was resolved.

72.     Plaintiff not only spoke up about her compensation, she also ensured that the Sales Agents on her team were properly paid.

73.     For example, Plaintiff meticulously reviewed her team's timecards and corrected them as needed to reflect the actual hours worked by each agent.

74.    When Plaintiff noticed that one agent named Kendahl had incorrectly recorded her time, Plaintiff corrected the mistake and documented the feedback she provided to that agent to ensure the time records were accurate moving forward.

75.    Plaintiff also noticed that some of her agents' timecards had numerous extra punches in and out because of Avaya and Charter Time malfunctioning, as described above. Plaintiff conferred with other Supervisors who observed the same phenomenon among their agents.

76.    Then Plaintiff corrected the timesheets as she had been trained to do to ensure the agents were paid for all of their time worked.

77.    Mr. Beach was so upset that Plaintiff demanded to be paid the amount promised to her that he began retaliating against her as described below.

## Retaliation

78.    After Plaintiff advocated for her own rights and prevented illegal conduct against others, Charter began pushing her out of her job.

79.    The final straw came in October 2024, when Plaintiff was absent from work during the many Jewish holidays that take place in the Fall.

80.    Despite having to take off days from work throughout the Jewish holiday month in October, Plaintiff still performed all her responsibilities.

81.    When Plaintiff returned to work after the last Jewish holiday in October, she was greeted with an alarming notification.

82.    On October 30, 2024, HR Director Alejandra Farley informed Plaintiff that she was being reviewed for termination. Skipping all preliminary modes of discipline, Charter put

Plaintiff's longtime employment on the chopping block the day after returning from religious leave.

83.    In particular, Ms. Farley stated that Plaintiff had deleted punches on sales agent Samantha Norton's timesheets, which caused Charter to overpay the sales agent.

84.    Plaintiff was in shock.

85.    In 2014, Charter leaders trained Plaintiff to review timecards and make historic edits when required. One of the most common corrections Plaintiff had to make on agents' timecards was historic edits – where the documented time on the timecard did not reflect the actual time worked.

86.    Based on Plaintiff's success and mastery of the timekeeping rules over the course of many years, Charter often tasked Plaintiff throughout her tenure as a Supervisor with training new Supervisors on how to review and correct the timesheets of sales agents.

87.    For years, Plaintiff and every Supervisor that she trained corrected inaccurate timesheets to prevent agents from not getting paid for all hours worked.

88.    Beginning in Sept. 2024, with Avaya and Charter Time malfunctioning frequently, Plaintiff and other Supervisors were often responsible for deleting extraneous punches – out and in – to ensure that sales agents received wages for all hours that they worked.

89.    During her conversation with Ms. Farley, Plaintiff explained how the malfunctions with Avaya and Charter Time often mistakenly logged sales agents out of the system and cause sales agents' timecards to be inaccurate. Plaintiff explained that if she did not delete the extra punches on her agents' timesheets, they would not be paid for all the hours that they worked.

90.    Plaintiff continued to oppose Charter's underpayment of sales agents.

91.     Plaintiff also demonstrated that Samantha Norton did in fact work during all the hours indicated on her corrected timesheets.

92.     Once Plaintiff made it abundantly clear to Ms. Farley that she edited the October timesheets correctly, Ms. Farley still seemed intent on keeping Plaintiff under scrutiny.

93.     Bizarrely, Ms. Farley then accused Plaintiff of "abusing work resources." The alleged "abuse" consisted of Plaintiff responding to one of her sales agents on WebX (the intraoffice chat application used by Charter) who offered to get Plaintiff a coffee on her way into work.

94.     Dumbfounded, Plaintiff requested further explanation of how the common and mundane act of responding to an agent's offer to bring in coffee was an offense worthy of termination after more than a decade of good performance.

95.     When Ms. Farley could not conjure any legitimate explanation, she told Plaintiff that she would further research both accusations and let Plaintiff know the results of her investigation.

96.     That same day, Plaintiff received a message from HR directing her to send in new paperwork to substantiate her need for intermittent FMLA. Plaintiff's intermittent FMLA had not expired, but Charter was now harassing and retaliating against Plaintiff for resisting wage theft, and needing FMLA and religious accommodations.

97.     The unjustified and baseless threat of termination, directly after Plaintiff's religious leave, caused Plaintiff to have a severe panic attack that resulted in her requiring three unpaid FMLA sick days to recover.

98.     On November 3, 2024, when Plaintiff finally recovered and returned to work, she submitted an ethics complaint via Charter's internal ethics process.

99.     Plaintiff complained that she was being targeted and threatened with termination for opposing and preventing wage theft from her agents. Plaintiff made clear that even after proving that she handled the timesheets of her agents properly, HR remained bent on slating her for termination. Plaintiff also stated that her supervisor had been retaliating against her since she complained about her own compensation – her commissions under the pilot program – being handled improperly.

100.     Rather than address Plaintiff's claims, Charter doubled down on its retaliation against Plaintiff.

101.     On November 21, 2024, Plaintiff was summoned by HR and reprimanded for two completely inane reasons. Plaintiff belongs to a private support group on Facebook where female victims of abuse and sexual harassment share information to prevent other women from being abused by their abusers. In this private group, Plaintiff confirmed that she had been sexually harassed at work by someone whom another woman had posted information about.

102.     Charter reprimanded Plaintiff for posting her experience with sexual harassment at work even though she did not write the name of her employer when posting in the support group chat.

103.     Charter also reprimanded Plaintiff for a separate social media post showing her support for the state of Israel.

104.     Charter told Plaintiff that it would be writing her up and opening an investigation into Plaintiff's alleged "violations."

105.     Clearly this meeting a was meant to intimidate Plaintiff and discourage her from speaking up.

106.    Plaintiff pointed out to HR that other Supervisors had posted similar content and had then been promoted and barely received a coaching, let alone a written warning. Faced with this obvious evidence of disparate treatment, HR then changed its threat and issued Plaintiff a "coaching" rather than a write-up.

107.    On December 26, 2024, HR informed Plaintiff that the investigation into her ethics complaint was complete, but it refused to share with her its conclusion.

108.    Instead, on December 30, 2024, Charter retaliated against Plaintiff yet again by issuing Plaintiff a Final Written Warning for correcting the October timesheets of her sales agents, an allegation Plaintiff had already proven to be utterly baseless.

109.    During Plaintiff's conversation with HR on December 30, she again explained that if she did not correct the timesheets in the way she did, her agents would have been underpaid and the Company would be liable for wage theft. Plaintiff also requested training specifically on how to address timesheets with mistaken punches.

110.    Plaintiff reminded HR how she had already shown them on October 30, 2024 how Samantha Norton's corrected timecards were in fact accurate. HR responded that they knew Plaintiff had done nothing "malicious" with Ms. Norton's timesheets.

111.    Instead, HR now took issue with another sales agent named Kendahl whose timesheets Plaintiff also had to correct in October because the sales agent had mistakenly indicated that she was out on FMLA leave on days that she was at work.

112.    Plaintiff then proved to HR that she not only properly corrected Kendahl's timesheets in October, but she also issued Kendahl a coaching in October to ensure that Kendahl understood how to properly record her time moving forward.

113.    Despite overwhelming evidence that Plaintiff took great pains to ensure that the timesheets of every single agent on her team was accurate, HR still told Plaintiff that they intended to issue her the Final Written Warning.

114.    HR told Plaintiff they would look into things and "make sure everything is kosher."

115.    Charter's nefarious and consistent retaliation took an immense toll on Plaintiff, who is the sole breadwinner for her family.

116.    Charter's decision to issue Plaintiff the Final Written Warning caused Plaintiff not to qualify for her end of year merit-based pay increase, an increase she not only deserved but needed.

117.    Plaintiff's panic attacks and migraines became severe, and she had to take a week off to recover.

118.    After Plaintiff returned to work from her leave, she had yet another meeting with HR on January 7, 2025. Again, Plaintiff successfully demonstrated how her edits to the agents' timesheets were valid under Charter timekeeping policies and prevented wage theft.

119.    During the meeting, Plaintiff questioned why, after years of editing timesheets in the exact same way, she was suddenly scrutinized and written up immediately after reporting her own mishandled pay and taking religious leave throughout the month of October. Plaintiff also asked whether all the other Supervisors she had trained to edit timesheets in this way were also being audited and reviewed for termination.

120.    Charter refused to answer her questions but promised that it would continue to investigate the propriety of how Plaintiff handled the timesheets, but the FWW would still

become part of Plaintiff's record, seemingly regardless of whether Plaintiff actually did anything wrong.

121.     The FWW was entered as a "Code of Conduct/Business Ethics" violation for "unauthorized time adjustments that aided financial overpayments for employees and non-compliance with proper timekeeping protocols in accordance with Charter's Time and Attendance Policy."

122.     On the same day, Charter informed Plaintiff that her religious accommodation had suddenly and mysteriously "expired," and that Plaintiff must immediately recertify that she still requires her religious accommodation.

123.     This inexplicable and baseless request was a textbook retaliatory and discriminatory action and was harmful to Plaintiff.

124.     According to Charter's own policy regarding religious accommodations, an employee does not need to prove on an annual or more frequent basis that they still adhere to their stated faith. Certainly, in the three months since Plaintiff observed the Jewish High Holy days, she had not given Charter any reason to believe that she no longer practiced her Jewish faith.

125.     Further, Charter already had in its records a letter from Plaintiff's rabbi stating her need for a Sabbath-accommodating schedule and the ability to take leave for certain Jewish holidays.

126.     Charter's demand that Plaintiff approach her rabbi again for another letter attesting to her observance was meant to harass and intimidate Plaintiff.

127.     The message was clear, an employee who advocates for their own proper payment and access to accommodations will suffer swift retaliation.

128.      On January 20, 2025, Plaintiff sent HR her renewed request for a religious accommodation to observe the Jewish Sabbath and holidays.

129.      On January 28, 2025, HR required Plaintiff to attend yet another meeting regarding her FWW. One of Charter's so-called "timekeeping experts" also joined the meeting.

130.      By the end of the meeting, the HR representative present admitted that Plaintiff had made a mistake, at worst. But she also admitted that Charter would not be recouping the alleged overpayment of wages to Kendahl. Upon information and belief, Charter would not recoup the money because it was clear that there was no actual overpayment of wages as a result of Plaintiff's actions.

131.      HR also required that Plaintiff participate in several timekeeping training modules. None of them addressed the problem of excess punches on agents' timesheets.

132.      Further escalating its discriminatory campaign against Plaintiff, Charter informed Plaintiff during that meeting that she would now have to recertify her request for a religious accommodation every six months even though that is not required by any documented Charter policy.

133.      Plaintiff told HR, Mr. Scuteri and the "timekeeping expert" that their retaliatory behavior was a violation of her civil rights.

134.      Upon information and belief, Charter regularly grants religious accommodations to non-Jewish employees without needing letters from religious leaders and without requiring recertification every six months.

135.      For example, Plaintiff observed that during the season of Ramadan, a Muslim employee requested that her lunch break be altered so she can take her lunch after her daily fast ended.

136.     The request was granted by Charter immediately without requiring any further documentation.

137.     Another Muslim employee requested that her entire shift be changed for two months to accommodate her Ramadan observance. The employee had a night shift and was quickly moved to a day shift as requested. Upon information and belief, Charter did not require this employee to submit a letter from her religious leader to prove her adherence to Islam.

138.     By contrast, Plaintiff is now required to prove her religious observance every six months regardless of whether she is requesting a change to her accommodations.

139.     Charter is singling out Plaintiff in retaliation for her refusal to allow wage theft against herself or her team of sales agents and because of her need for a Jewish religious accommodation.

140.     On or about February 10, 2025, Plaintiff participated in another shift bid. Because Plaintiff ranked number seven among her peers, she easily qualified for a schedule that accommodates her Sabbath observance. Plaintiff would have been assigned her preferred schedule even without utilizing a religious accommodation.

141.     However, when her supervisor, Mr. Beach announced the shift bid in front of all the Supervisors, he repeatedly announced that Plaintiff's shift was "reserved for someone's religious accommodation."

142.     Mr. Beach's announcement caused Plaintiff's colleagues to have the impression that an employee would be receiving that preferred shift without actually qualifying for it based on their shift bid rank. Further, all of Plaintiff's colleagues are aware that she is Sabbath observant and needs a shift that does not include Friday evenings or Saturdays.

143.     Mr. Beach's repeated statements about the shift being reserved needlessly caused Plaintiff's peers to resent her for getting a shift that Mr. Beach implied she did not deserve.

144.     On February 19, 2025, Charter presented Plaintiff with her 2024 annual performance review. Despite the documented success of Plaintiff's team and her success in every aspect of her role, Plaintiff was informed that as a result of her FWW for "time card theft," she would not receive her annual merit-based raise.

145.     Then Plaintiff was reassigned to a new team of sales agents, most of whom have a history of underperformance.

146.     The team change came with a warning – if Plaintiff does not meet sales goals with this new team, she will be terminated.

147.     It is clear that no amount of evidence of Plaintiff's innocence will prevent Charter from punishing her for her need for a religious accommodation or for her refusal to steal wages from her agents.

148.     As a result of Charter's relentless retaliation, Plaintiff has suffered immense emotional distress, the loss of her annual pay increase, and is now on track to lose the only source of income her family has.

<u>**FIRST CLAIM FOR RELIEF**</u>
**FLSA Overtime Violations, 29 U.S.C. § 201, *et seq.***
**(Brought by Plaintiff on Behalf of Herself and the FLSA Collective Plaintiffs)**

149.     Plaintiff realleges and incorporates by reference all previous paragraphs.

150.     Throughout the statute of limitations period covered by these claims, Plaintiff and the other FLSA Collective Plaintiffs worked in excess of forty (40) hours per workweek.

151.        At all relevant times, Defendant operated under a decision, policy and plan, and under common policies, programs, practices, procedures, protocols, routines and rules of willfully failing and refusing to pay Plaintiff and the FLSA Collective Plaintiffs the required overtime rates for hours worked in excess of forty (40) hours per workweek, and willfully failing to keep records required by the FLSA even though the FLSA Collective Plaintiffs have been and are entitled to overtime.

152.        Plaintiff, on behalf of herself and the FLSA Collective Plaintiffs, seeks damages in the amount of her unpaid overtime compensation, liquidated (double) damages as provided by the FLSA for overtime violations, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### New York Labor Law ("NYLL") Overtime Violations
### N.Y. Lab. L. § 650 *et seq.*, N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2

153.        Plaintiff realleges and incorporates by reference all previous paragraphs.

154.        It is unlawful under New York law for an employer to suffer or permit a non-exempt employee to work without paying proper overtime wages for all hours worked in excess of forty (40) hours in any workweek.

155.        Defendant willfully, regularly and repeatedly failed to pay Plaintiff at the required overtime rate for hours worked in excess of forty (40) hours per workweek.

156.        As a result of Defendant's willful and unlawful conduct, Plaintiff is entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by N.Y. Lab. Law § 663.

## THIRD CLAIM FOR RELIEF
### NYLL Retaliation Claim
### N.Y. Lab. L. §215

157.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

158.     In violation of the NYSHRL, Defendant retaliated against Plaintiff for complaining about wage theft and for taking FMLA leave.

159.     As a direct and proximate consequence of Defendant's retaliation against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

160.     As a direct and proximate consequence of Defendant's retaliation against Plaintiff, Plaintiff suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputations, lasting embarrassment, humiliation and anguish.

161.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, liquidated damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
**New York Notice Requirements, N.Y. Lab. L. §§ 195, 198**

162.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

163.     Defendant did not provide Plaintiff with the wage statements required by N.Y. Lab. Law § 195(3).

164.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to an award of damages in amount to be determined at trial, pre- and post-judgment interest, and costs and attorneys' fees.

## FIFTH CLAIM FOR RELIEF
### Section 1981 ("Section 1981") – Race Discrimination

165.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

166.     In violation of Section 1981, Defendant discriminated against Plaintiff on the basis of her Jewish race.

167.     As a direct and proximate consequence of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

168.     As a direct and proximate consequence of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputations, lasting embarrassment, humiliation, and anguish.

169.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
### Section 1981 – Retaliation.

170.         Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

171.         In violation of Section 1981, Defendant retaliated against Plaintiff for complaining about discrimination on the basis of Plaintiff's Jewish identity.

172.         As a direct and proximate consequence of Defendant's retaliation against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

173.         As a direct and proximate consequence of Defendant's retaliation against Plaintiff, Plaintiff suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputations, lasting embarrassment, humiliation and anguish.

174.         As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
### FMLA Retaliation – 29 U.S.C. § 2601 *et seq.*

175.         Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

176.         Defendant is an employer under the FMLA, as it employs more than 50 employees within a 75-mile radius.

177.         Plaintiff was eligible for FMLA leave as she had worked for Defendant more than 1,250 hours in the 12-month period preceding her leave.

178.         In violation of the FMLA, Defendant intentionally discriminated/retaliated against Plaintiff because she took FMLA-protected leave and required ongoing intermittent FMLA leave.

179.         As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including but not limited to loss of income, including past and future salary, and benefits.

180.         As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, liquidated damages, interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

### EIGHTH CLAIM FOR RELIEF
**New York State Human Rights Law ("NYSHRL") – Discrimination**

181.         Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

182.         In violation of the NYSHRL, Defendant discriminated against Plaintiff on the basis of her religion.

183.         As a direct and proximate consequence of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

184.         As a direct and proximate consequence of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputations, lasting embarrassment, humiliation, and anguish.

26

185.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## NINTH CLAIM FOR RELIEF
### New York State Human Rights Law ("NYSHRL") - Retaliation

186.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

187.     In violation of the NYSHRL, Defendant retaliated against Plaintiff for complaining about religious discrimination.

188.     As a direct and proximate consequence of Defendant's retaliation against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

189.     As a direct and proximate consequence of Defendant's retaliation against Plaintiff, Plaintiff suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputations, lasting embarrassment, humiliation and anguish.

190.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## TENTH CLAIM FOR RELIEF
### New York State Whistleblower Law
### N.Y. Lab. L. § 740 ("NYLL")

191.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

192.    In violation of the NYLL, Defendant retaliated against Plaintiff for her refusal to engage in and her opposition to wage theft.

193.    Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected rights.

194.    As a direct and proximate consequence of Defendant's retaliation against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish.

195.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for lost wages and emotional distress, as well as punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the FLSA Collective Plaintiffs, prays for relief as follows:

A.    Designation of this action as a collective action on behalf of the FLSA Collective Plaintiffs and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the FLSA opt-in class, apprising them of the pendency of this action, and permitting them to assert timely FLSA claims and state

claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C.

§ 216(b);

B.      Designation of Plaintiff as Representative of the FLSA Collective

Plaintiffs;

C.      An award of damages, according to proof, including liquidated damages, to

be paid by Defendant;

D.      Penalties available under applicable laws;

E.      Costs of action incurred herein, including expert fees;

F.      Attorneys' fees, including fees pursuant to 29 U.S.C. §§ 216, 2617; 42

U.S.C. § 1988; N.Y. Lab. L. §§ 198, 663, 740; and other applicable statutes;

G.      Pre-judgment and post-judgment interest, as provided by law; and

H.      Such other and further legal and equitable relief as this Court deems

necessary, just and proper.


Dated: New York, New York          Respectfully submitted,
        May 13, 2025                JOSEPH & KIRSCHENBAUM LLP

                                    By: /*s/ D. Maimon Kirschenbaum*
                                        D. Maimon Kirschenbaum
                                        32 Broadway, Suite 601
                                        New York, NY 10004
                                        Tel: (212) 688-5640
                                        Fax: (212) 981-9587


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to

which she has a right to jury trial.